AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   '22 MJ1920 |
| Pink Apple iPhone Seized as FP&F No. 2022565600010402 Item 001 ("Target Device 1") | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| Title 8, U.S.C. § 1324 | Alien Smuggling | |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Carly A. Herbert, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Carly A. Herbert, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: _____05/27/2022_____

_____
*Judge's signature*

City and state: San Diego, California

HON. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

1

## ATTACHMENT A-1

2

PROPERTY TO BE SEARCHED

3  The following property is to be searched:

4  Pink Apple iPhone
Seized as FP&F No. 2022565600010402 Line 001
5  **("Target Device 1")**

6
Target Device is currently in the custody of the Department of Homeland Security,
7  Customs and Border Protection, United States Border Patrol, San Diego Sector.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

## ATTACHMENT B

### ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **April 13, 2022, through May 13, 2022**:

a.   tending to indicate efforts to smuggle aliens from Mexico into the United States; and transport aliens inside the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.   tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.   tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

14



## AFFIDAVIT

I, Carly A. Herbert, being duly sworn, hereby state as follows:

## INTRODUCTION

1.      I submit this affidavit in support of an application for warrants to search the following electronic devices:

> Pink Apple iPhone
> Seized as FP&F No. 2022565600010402 Line 001
> (**"Target Device 1"**)
>
> Blue MOXEE Cell Phone
> Seized as FP&F No. 2022565600010401 Line 001
> (**"Target Device 2"**)

the **"Target Devices"**, as further described in Attachments A-1, A-2, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.      The requested warrants relate to the investigation and prosecution of Courtney Nicole KOLLATH and Danny Foster WADE JR for transporting and moving illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of the investigation into this matter.   Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for three years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

2

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.    The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

3

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

4

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.    On May 13, 2022, Border Patrol Agent E. Ellingworth, while wearing a full rough duty uniform with a badge and all insignia visible, was performing assigned duties in the Boulevard Border Patrol Station's area of responsibility. At approximately 7:25 PM, Agent Ellingworth was advised over agency radio by Border Patrol Agent L. Martinez-Noriega who was operating a Mobile Surveillance Capabilities truck, of a Cadillac Escalade that was driving slowly westbound on Old Highway 80 and making a u-turn, and then quickly speed away going eastbound on Old Highway 80. At approximately 7:35 PM Supervisory Border Patrol Agent E. Douyard observed the Escalade pass his location and Agent Douyard began following the Escalade going eastbound on Old Highway 80.

12.    Agent Douyard then activated his lights and sirens, and conducted a vehicle stop on the Escalade, eastbound on Old Highway 80 near mile marker 39.5. Agent Douyard observed from his vehicle that the driver was a female, later identified as, defendant Courtney Nicole KOLLATH, wearing a bright neon green t-shirt. Agent Douyard exited his vehicle and as Agent Douyard touched the rear passenger taillight, the Escalade sped off eastbound on Old Highway 80. Agent Douyard then engaged in a pursuit of the Escalade. Agent Douyard then observed the Escalade turn left onto In-Ko-Pah Park Road and then make another left onto the Interstate 8 westbound ramp. Agent Douyard maintained visual of the Escalade going approximately 100 miles an hour and observed KOLLATH make an abrupt exit onto Ribbonwood Road and go southbound.

13.    At approximately 7:43 PM Border Patrol Agent C. Seal relayed via agency radio that he had successfully deployed a Vehicle Immobilization Device on the Escalade. Agent Douyard remained in pursuit as the Escalade continued southbound on Ribbonwood Road as the road changes names to Jewel Valley Road. Agent Douyard then observed the Escalade stop on the dirt shoulder of Jewel Valley Road and observed the driver,

5

1  KOLLATH, wearing her bright neon green t-shirt, and a tall white male later identified as

2  defendant Danny Foster WADE Jr., running eastbound onto a residential property.

3      14.    Agent Douyard while in his vehicle, commanded WADE to stop running and

   get on the ground. WADE complied immediately, and Agent Douyard exited his vehicle

4  and placed WADE under arrest at approximately 7:44 PM. At the same time, Agent

5  Douyard observed a family with small children outside their trailer playing in the same

   location where he had seen KOLLATH running toward. Agent Douyard relayed via agency

6  radio for other agents to be aware that there was a family in the area. Border Patrol Agent

7  A. Garcia arrived at the location and was able to locate KOLLATH, hiding underneath the

8  trailer, and at approximately 7:44 PM Agent Garcia placed KOLLATH under arrest.

9      15.    At the time of arrest, Agents found a pink Apple iPhone (**"Target Device 1"**)

   inside the Escalade. The defendant, Courtney Nicole KOLLATH advised Agents that

10 **Target Device 1** belonged to her. Agents also recovered a blue MOXEE cell phone

11 (**"Target Device 2"**), and the defendant, Danny Foster WADE JR, advised Agents that

   **Target Device 2** belonged to him. These devices were subsequently seized.

12     16.    Border Patrol Agent N. Fulford and Border Patrol Agent J. Kreighauser

13 arrived on scene and began looking for any additional subjects that had absconded from

   the Escalade. Agent Fulford then observed footprints leading west into the bushes and saw

14 an individual later identified as material witness Delfino Ernesto ESTRADA-Pichardo,

15 laying in thick brush approximately five yards from the Escalade. Agent Kreighauser then

16 conducted an immigration inspection on D. ESTRADA and he stated that he is a citizen of

17 Mexico without any immigration documents allowing him to enter or remain in the United

   States legally. Agent Fulford spotted another set of footprints leading west away from the

18 Escalade, and spotted another individual, later identified as material witness Gustavo

19 ESTRADA-Mendez, laying in the bushes approximately one quarter mile west of the

20 Escalade. Agent Fulford then conducted an immigration inspection on G. ESTRADA and

   he stated that he is a citizen of Mexico without any immigration documents allowing him

21

6

to enter or remain in the United States legally. At approximately 7:55 PM Agent Kreighauser placed D. ESTRADA under arrest and at approximately 8:08 PM Agent Fulford placed G. ESTRADA under arrest.

17. At approximately 10:00 PM, WADE was read his Miranda rights. WADE stated he understood his Miranda rights and was willing to answer questions without an attorney present. WADE stated that he met with an unknown male and was offered a job driving illegal aliens, he accepted the offer. WADE stated that he arrived at the pick-up location and two individuals entered the back seat of the vehicle and they drove away. WADE stated that he and KOLLATH drove eastbound and noticed that a marked Border Patrol vehicle was behind them with their emergency equipment activated. WADE advised KOLLATH to pull over, and when the Agent attempted to approach the vehicle, that KOLLATH said "I'm scared" and drove away from the Border Patrol Agent. WADE claimed he observed a Border Patrol Agent throw spikes and the next thing he knew they had been in a vehicle accident. WADE claimed that KOLLATH told him to run from the vehicle, so he did.

18. At approximately 9:43 PM, KOLLATH was read her Miranda rights. KOLLATH stated she understood her Miranda rights and was willing to answer questions without an attorney present. KOLLATH stated that she would be paid $600 USD for each individual that her and WADE picked up. KOLLATH stated she got about halfway between the town and Carrizo Gorge Road, she saw two individuals walking near the road. She pulled over and they ran towards their car and quickly got into the back seat. Once they got in her vehicle, KOLLATH stated she could tell they were Mexican, based on their looks, the way they ran from the brush and the fact they did not speak any English, she was certain. KOLLATH stated she was pulled over by Border Patrol, while she was pulled over, WADE was on the phone with someone who was telling them to get out of there. KOLLATH stated she panicked and took off before the agents got to her vehicle. When asked if she could see the Border Patrol Agents behind her she stated, "Yes. I could."

7

KOLLATH estimated she was traveling at speeds over 100 mph as she attempted to elude Border Patrol Agents. As she saw them in her rear-view mirror, she stated she could only think that she needed to get off the highway. KOLLATH stated she then took the Ribbonwood Exit off Interstate 8 and began traveling south. She noticed multiple other Border Patrol vehicles there and saw one agent throw spikes across the road. She did not know if she had hit the spikes and kept driving, but said they quickly stopped after that. Once their vehicle stopped, she said she did not want to be caught because she knew she was in more trouble for fleeing. KOLLATH stated she did not run very far before hiding near a big truck. After realizing WADE was caught she stayed behind the truck where she was found by Agents.

19.    Material witnesses G. ESTRADA and D. ESTRADA stated they are citizens and nationals of Mexico in the United States illegally without proper documents allowing them to enter or remain in the United States legally. D. ESTRADA and G. ESTRADA stated that they were instructed to hide by the highway for four or five hours until they received a phone call that a car was there to pick them up. D. ESTRADA and G. ESTRADA both claimed that they feared for their lives because of how fast Escalade was going and thought the driver might lose control of the Escalade. G. Estrada stated he was going to pay approximately $6,000 USD to be successfully smuggled into the United States.

20.    Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the defendants, Courtney Nicole KOLLATH and Danny Foster WADE JR, were using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the defendants,

8

Courtney Nicole KOLLATH and Danny Foster WADE JR, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.   Accordingly, I request permission to search the **Target Device** for data beginning on **April 13, 2022, through May 13, 2022**.

## METHODOLOGY

21.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

22.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

23.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date this warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

24.     Law enforcement has previously attempted to obtain the evidence sought by this warrant. Warrants were previously obtained for the **Target Devices**. However, the prior warrants inadvertently included the incorrect FP&F identifiers and, as a result, the Target Devices could not be downloaded. The prior warrants were returned unexecuted.

**CONCLUSION**

25.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

26.     Because the **Target Devices** were seized at the time Courtney Nicole KOLLATH and Danny Foster WADE JR were arrested and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **April 13, 2022, through May 13, 2022.**

27.    Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1, A-2, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Carly A. Herbert
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of May 2022.

_____
Hon. Andrew G. Schopler
United States Magistrate Judge

11